IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEQUOIA FORESTKEEPER,<br><br>        Plaintiff,<br><br>            v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>        Defendants.<br>_____/ | CASE NO. 1:09-cv-00392-LJO-JLT<br><br>ORDER DENYING PLAINTIFF'S MOTION TO COMPEL SUPPLEMENTATION OF THE RECORD<br><br>(Doc. 38) |

Pending before the Court is Plaintiff's Motion to Compel Supplementation of the Administrative Record. (Doc. 38).

**I.   Background**

The following background facts do not appear to be in dispute. The SUP which is the subject of this suit permits the Quarter Circle 5 Ranch, owned by Robert Sellers since 1983, to operate and maintain a dam on Fay Creek for the purpose of transmission and diversion of domestic and irrigation water. Water diversion has been continuous on this property for more than 100 years. The present dam was built in 1935. Originally the landowner was operating an electrical powerhouse associated with the dam. The powerhouse was decommissioned in 1967. Since that time, the SUPs issued by Defendant Forest Service have been for purposes of irrigation not hydroelectric power. The most recent SUP approved by Defendant Forest Service was in 2003 for a ten-year period.

On March 2, 2009, Plaintiff filed a complaint seeking declaratory and injunctive relief from

Defendants[1] for violations of federal and state law, including the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231-4370(d); the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., the Federal Water Pollution Control Act ("the Clean Water Act"), 3 U.S.C. §§ 1251 et seq, and the Forest Service's regulations and policies, when Defendants reissued a special use permit ("SUP") to Quarter Circle Five Ranch, owned by Robert J. Sellers, allowing the diversion of water from Fay Creek. (See Doc. 10 at 2, 9-21).

Specifically, Plaintiff alleges that Defendants failed to prepare an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA"); failed to provide a reasoned explanation for not preparing the same; failed to consider the environmental impacts and effects of reissuing the SUP; failed to require the applicant to present a water quality certification required by state and federal law; and arbitrarily and capriciously reissued a SUP for an ongoing activity that was not in conformance with the law.

**II.     Summary of Plaintiff's Motion to Compel and Defendants' Opposition**

The Administrative Record ("AR") was filed on March 10, 2010. (See Doc. 34). On April 30, 2010, Plaintiff filed a Motion to Compel Supplementation of the Record to include "a document that Defendants refused to include in the Administrative Record," namely, Appendix 31 to the "Water Quality Control Plan for the Tulare Lake Basin." (Doc. 38). In its accompanying memorandum, Plaintiff contends that in California, "Regional Quality Control Boards develop basin plans to set forth water quality standards." (Doc. 39 at 2). Pursuant thereto, Plaintiff notes that the Central Regional Water Quality Control Board adopted and the U.S. Environmental Protection Agency ("EPA") approved, the "Water Quality Control Plan for the Tulare Lake Basin" which includes the property and dam in question in this case.

Plaintiff further contends that documents that are part of the AR submitted by Defendants refer to the Tulare Basin Plan and, thus, "indicate that the Defendants relied on this document in reaching their decision to issue the SUP permitting the damming and diversion of Fay Creek." (Doc. 39 at 3). For

---

[1] A First Amended Complaint was filed on June 8, 2009. (Doc. 10).

instance, Plaintiff cites to specific references to the Plan in a document entitled "Fisheries and Aquatics Report on Project Compliance, with the Sierra Nevada Forest Plan Amendment Riparian Conservation Objectives," which it claims was "prepared by the U.S. Forest Service fisheries biologist to evaluate the impact of the proposed issuance of the SUP for the Fay Creek Diversion on aquatic resources." (Id.) Plaintiff further contends that "[t]he Fisheries and Aquatics Report specifically examined whether the proposed project would affect the ability of Fay Creek to meet assigned beneficial uses." (Id.)

In its motion, Plaintiff objects to Defendants' refusal to include additional portions of the Tulare Basin Plan in the AR, in particular, "Appendix 31" of the Plan. Appendix 31 is a document issued in 1983 entitled "Guidelines for Protection of Water Quality during Construction and Operation of Small Hydro Projects." (Doc. 38, Exhibit Appendix 31). By its own terms the document recounts "Policies and Procedures" for the Regional Board "for addressing water quality-related impacts of small hydro projects." (Id. at 2). The document specifically addresses issues such as water temperature, turbidity, sediment, settleable material and dissolved oxygen, as well as providing standards and requirements for construction and operation of such projects within the Tulare Basin. (See id. at 2, 3-4).

Plaintiff argues that Appendix 31 should be part of the AR because "it was before Defendants at the time Defendants made their final decision" in that "[i]t is part of the Tulare Basin Plan that was relied on by Defendants to prepare the Fisheries and Aquatics report." (Doc. 39 at 5). In particular, Plaintiff asserts that Appendix 31 is part of the Plan "that most specifically addresses the type of structure – a small hydro project – that the Forest Service approved in the SUP." (Id.)

Defendants oppose inclusion of Appendix 31 in the AR because "it was not considered in the determination of whether to reissue the subject SUP" and, thus, is irrelevant. (Doc. 45 at 2). While Defendants agree that references to the Tulare Lake Basin Plan are included in documents already in the record, specifically in three pages of a biological analysis authored by Teresa Tharalson,[2] who they identify as a "then District Aquatic and Fisheries Specialist," that was issued in 2002 as part of the process which culminated in re-issuance of the SUP, they argue that references to the Plan in two of the

---

[2] Plaintiff references this report as the "Fisheries and Aquatics Report" but citations to the AR in both briefs indicate that this is the same document identified by Defendants as that authored by Teresa Tharalson. (See Doc. 39 at 3; Doc. 45 at 3-4).

3

pages concern a different SUP than the one at issue here, and that the only other reference to the Plan on a third page of that report states simply that "[s]urface water quality in the [Tulare Lake] Basin is generally good, with excellent quality exhibited in most eastside streams." (Id. at 4). In particular, Defendants contend that there is no specific reference to Appendix 31 or its contents in the Tharalson report and assert that "[t]here is no evidence that Appendix 31 is relevant to or was considered as part of the decision-making process in the re-issuance of this SUP, or its associated analysis." (Id.) At oral argument on this motion, Plaintiff's counsel admitted that these references to the Tulare Basin Plan *did not include* information taken from Appendix 31.

## III. Analysis

### A. Law Generally

Plaintiff is seeking review pursuant to the APA. The APA provides that in making its decision, "the court shall review the whole record or those parts of it cited by a party, . . ." 5 U.S.C. § 706. The "'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by the agency decision-makers and includes evidence contrary to the agency's position." Thompson v. U.S. Department of Labor, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original). However, the record reviewed should be "the administrative record already in existence, not some new record made initially in the reviewing court." Center for Biological Diversity v. U.S. Fish and Wildlife Service, 450 F.3d 930, 943 (9th Cir. 2006) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also Maritel, Inc. v. Collins, 422 F.Supp.2d 188, 196 (D.D.C. 2006) ("To ensure fair review of the agency action . . . the court 'should have before it neither more nor less information than did the agency when it made its decision.'")

An agency enjoys "a presumption that it properly designated the administrative record," and this imposes on the moving party "the burden of going forward with evidence to meet or rebut the presumption." Blue Ocean Institute v. Guttierez, 503 F.Supp.2d 366, 369 (D.D.C. 2007). However, an agency "may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made." Id. In addition, the agency may not exclude information from the AR simply because it did not "rely" on the excluded information in its final decision. Maritel, Inc., 422 F.Supp.2d at 196. The Court has the authority to permit

4

supplementation of the record only in "limited circumstances" including circumstances in which the agency relied on documents not in the record in reaching its decision. See The Sierra Club v. Dombeck, 161 F.Supp.2d 1052, 1063-64 (D.Ariz. 2001).

### B.    Plaintiff has not met burden of establishing entitlement to supplementation of the Administrative Record

Plaintiff asserts that the record should reflect all information that was "before" the Agency when it reissued the SUP in 2003. Specifically, Plaintiff argues that the Tulare Basin Plan was specifically "referenced" in a "Fisheries and Aquatics Report . . . prepared by a U.S. Forest Service fisheries biologist to evaluate the impact of the proposed issuance of the SUP for the Fay Creek Diversion on aquatic resources." (Doc. 39 at 3). Although Plaintiff conceded at oral argument that neither Appendix 31 nor any of its contents are addressed in this report, Plaintiff nevertheless argues that since other portions of the Tulare Basin Plan are specifically discussed, the Plan in its *entirety* was "before" the Agency and all of it, including Appendix 31, should be part of the administrative record.

Defendants acknowledge that portions of the Tulare Basin Plan are included in the current record. In particular, Defendants note references to the Tulare Basin Plan in a "supporting biological analysis" report authored by Teresa Tharalson[3] that was developed by the Forest Service for use in considering whether to re-issue the Sellers' SUP in 2003. The parties agree that only three specific references to the Tulare Basin Plan were mentioned in the Tharalson report. They agree that two of the references refer to a different, unrelated SUP and that none of the references contain information taken from Appendix 31 or discuss Appendix 31. As a result, the Defendants contend that "[t]here is no evidence that Appendix 31 is relevant to or was considered as part of the decision-making process in the re-issuance of this SUP, or its associated analysis" and, thus, it was not "relied" on by the Forest Service in re-issuing the SUP. (See Doc. 45 at 4-5). In support, Defendants point out that Appendix 31, by its own terms, addresses only hydroelectric projects and that the Sellers' dam has been used only for irrigation, rather than power generation, since 1967. Likewise, they note that the Sellers' dam was built nearly 50 years before the promulgation of Appendix 31 in 1983. (Id. at 4).

---

[3] Defendants identify Tharalson as a "then District Aquatic and Fisheries Specialist" with the U.S. Forest Service. (Doc. 45 at 3).

1    The only authority cited by Defendants for their assertion that materials not relied upon by the Agency need not be included in the record is The Sierra Club v. Dombeck, 161 F.Supp.2d 1052, 1064 (D.Ariz. 2001). While the Court agrees that materials "relied" upon by the Agency in reaching its decision must be a part of the record, case law indicates that whether certain materials were "relied on" is not the test to determine whether materials are excluded. See Maritel, 422 F.Supp.2d at 196; Ad Hoc Metals Coalition v. Whitman, 227 F.Supp.2d 134, 139 (D.D.C. 2002); AMFAC Resorts, LLC. v. U.S. Dept. Of Interior, 143 F.Supp.2d 7, 12 (D.D.C. 2001) ("a complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision"). Similarly, the standard advanced by Plaintiff, that any materials which were "before" it should be included in the record, is a rather vague and esoteric concept. In San Luis & Delta-Mendota Water Authority, et al. v. Salazar, 2009 U.S. Dist. LEXIS 116985 at *9 (E.D. Cal. 2009), the Court observed that "Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hand of a third party would render judicial review meaningless." Rather the proper measure for the "whole" record is that a reviewing court have before it "neither more nor less information than did the agency when it made its decision." Id. In both Thompson and Maritel, cited prominently by Plaintiff, the courts defined the proper administrative record to include not just "those documents that the agency has compiled and submitted," but "all documents and materials directly or indirectly *considered* by agency decision-makers . . ." Thompson, 885 F.2d at 555; Maritel, 422 F.Supp.2d at 196. (Emphasis added). Plaintiff argues that Appendix 31 was "indirectly considered" by the Agency because it was part of the Tulare Basin Plan, other portions of which *were* considered by the Agency. Plaintiff cites no case law to support that this requires a finding that Appendix 31 was "indirectly considered."

In Ad Hoc Metals Coalition, the plaintiff sought supplementation of the record to include a transcript of a workshop which documented "the detailed scientific and technical presentations made at the workshop, [that] reveals flaws in EPA's scientific justification" for a rule decided by that agency. See id. at 138. The EPA opposed supplementation, arguing, *inter alia*, that the transcript "was not relied upon by EPA during its decisionmaking and is merely cumulative of material submitted by other organizations during the comment period." Id. The court rejected exclusion of the transcript "simply

6

because defendants claim that they did not 'rely' upon it." Id. at 139. The court noted that the EPA was a cosponsor of the workshop and the "main impetus" behind it, and further noting that EPA officials participated "as presenters and attendees, . . . [and] were in a position to hear and consider arguments" raised at the workshop relative to the rule at issue. Id. The transcript demonstrated that the EPA was aware of scientific views adverse to its decision and that those views "were known to and . . . considered by EPA at the time it issued the final rule." Thus, the adverse views contained in the transcript, "having been referred to, considered by, or used by EPA before it issued its final rule must be included in the administrative record, particularly, given the adverse nature of its contents." Id.

In Center for Biological Diversity v. U.S. Bureau of Land Management, 2007 U.S. Dist. LEXIS (N.D. Cal. 2007), Plaintiff's challenged BLM's failure to comply with NEPA when it designated "off-road vehicle ("ORV") routes in the West Mojave Plan area of the California Desert Conservation Area." (Id. at *4-5). Plaintiff sought to supplement the administrative record to include various documents including "data and documents . . . developed in a 1998-2002 off-road vehicle route designation effort for the Western Mojave referred to by the parties as the "Box" or "Black Box" process." Id. BLM opposed this effort on the basis that this data was flawed and, thus, not "used" or "relied on" in its final decision. Id. at *12. The court disagreed with BLM's argument and found that the issue was not whether BLM actually "relied" on the Box data. The court noted that because the Box data was developed by BLM (and thus, known to it) and it related directly to the issue in question, it was "before" the agency "at least indirectly." Id. at *14-15. Thus, the court determined that it should be part of the record. Id.

Last, in Miami Nation of Indians of Indiana v. Babbitt, 979 F.Supp. 771 (N.D. Ind. 1996), Plaintiff challenged a determination by the Department of the Interior that denied it "tribe acknowledgment." Id. Plaintiff sought supplementation of the administrative record to include numerous documents, including certain "treatises" and "draft reports, guidelines and directives." It based this motion upon its argument that the Department's decision was flawed, inconsistent with other tribal recognition decisions and because the record was "unclear" as to what internal "guidelines, directives, or manuals" were used by the Department in considering the application, Id. at 776-77.

The Department objected to such a sweeping request because it would require inclusion of

documents that had no bearing on the its decision and were not relevant to Plaintiff's application for tribal recognition. <u>Miami Nation</u> 979 F.Supp. at 777. The court noted that the Department,

> . . . also objects to the Miamis' request that the administrative record be completed with copies of BAR guidelines, directives, and manuals that were used by the agency to interpret the recognition procedures or regulations. The United States asserts that so sweeping a request would require the addition of "historical treatises and articles written by individuals which do not reflect the positions of the Department and which do not even mention the Miamis."

<u>Id.</u> at 777. The Court concluded that "a document need not literally pass before the eyes of the final agency decision maker to be considered part of the administrative record." <u>Id</u>. Instead, all materials, including the types of materials described above should be included in the record if the materials were "directly or indirectly considered." The court indicated, however, that the Department need only include those "portions" of documents that it actually *considered* in making its decision. <u>Id</u>. at 777 n. 2.

In <u>Ctr. for Native Ecosystems v. Salazar</u>, 2010 U.S. Dist. LEXIS 49498 at *21 (D. Colo. 2010), the court outlined when a court may find that an omitted document was considered by the agency. It held,

> The proper touchstone remains the decision makers' actual consideration, and a party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process. For example, **if a party moves to include a study** that was cited in the recommendations of subordinates, **the party need not show that the decision maker read the study, but the party must show that the study was so heavily relied on in the recommendations that the decision maker constructively considered it.**

(Emphasis added.) Likewise, in <u>WildEarth Guardians v. Salazar</u>, 2009 U.S. Dist. LEXIS 110588 at *10-11 (D. Ariz. 2009), the plaintiff asserted that every source underlying a cited document must be included in the record as information that was "indirectly" considered. The court evaluated and rejected this argument:

> Next, plaintiff contends that considering the petition and a report in the record requires considering their underlying sources, if only indirectly. Thus, all eleven documents were before the Secretary by way of citation. In response, the Secretary claims that a consideration-through-citation rule would be practically unworkable because it would require collecting all sources cited in all reports. These positions are, of course, extremes. **For present purposes, we find no indication that either the petition or the report relies so heavily on the underlying sources in question that one might fairly be said to have considered the sources merely by considering the documents in which they are cited.** Therefore, we deny plaintiff's motion to the extent that it seeks to challenge the record as incomplete.

Id. Thus, the court rejected that merely because an underlying source was cited in a document does not mean that the source was "considered" and properly part of the administrative record.

Unlike the information at issue in Ad Hoc Metals Coalition and Center for Biological Diversity, there is no evidence that Appendix 31 was within the contemplation of the agency. Instead, Appendix 31 was an underlying source document for information contained in a different, non-cited portion of the Tulare Basin Plan. Notably, by its own terms, Appendix 31 regulates only dams constructed and operated for hydroelectric purposes. There is no dispute that the dam at issue here has been used solely for irrigation purposes for decades and had already been converted to this use long before Appendix 31 was promulgated. Nevertheless, even assuming that Appendix 31 applies to irrigation dams, Plaintiff has failed to demonstrate that the decision of the agency relied so heavily on Appendix 31 so that it may be said that the agency considered it indirectly through its direct consideration of the Tulare Basin Plan. WildEarth Guardians at *10-11. To the contrary, the citations to the Tulare Basin Plan contained in the record, *do not rely upon or even refer to information taken from Appendix 31.*

For these reasons, the Court concludes that Plaintiff has not overcome the presumption that the administrative record compiled by Defendants is complete. Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion to Compel Supplementation of the Record (Doc. 38) to include Appendix 31 of the Tulare Basin Plan is **DENIED**.

IT IS SO ORDERED.

Dated:  **June 11, 2010**                                         /s/ Jennifer L. Thurston
                                                                                       UNITED STATES MAGISTRATE JUDGE