1

2

3

4

5                **IN THE UNITED STATES DISTRICT COURT**

6            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

8   SEQUOIA FORESTKEEPER,                CASE NO. CV F 09-392 LJO JLT

9                                        **ORDER ON CROSS-MOTIONS FOR**
                                       **SUMMARY JUDGMENT**  (Docs. 58, 71)

10                   Plaintiff,

        vs.

11

  UNITED STATES FOREST SERVICE,

12   et al.,

13                  Defendants.

14   _____/

15                        **INTRODUCTION**

16         Plaintiff Sequoia Forestkeeper initiated this action to seek judicial review of defendant United

17 States Forest Service's ("USFS's")[1] re-issuance of a Special Use Permit ("SUP") to Robert Sellers and

18 Quarter Circle Five Ranch (collectively "Sellers") in 2003, pursuant to the Administrative Procedure Act

19 ("APA"), 5 U.S.C. §§701-706.  The SUP authorizes Sellers to use a water diversion that diverts water

20 flowing from Fay Creek via a dam located within the boundaries of the Sequoia National Forest for

21 private use ("diversion").  Sequoia Forestkeeper argues that by re-issuing the SUP, the USFS violated:

22 (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§4321-4347, for failure to prepare an

23 Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") despite warnings

24 from the California Department of Fish and Game, Sequoia Forestkeeper, and downstream landowners

25 that the SUP would result in significant harm to the environment (first cause of action); (2) NEPA, for

26 _____

27        [1]Defendants are the  United States Forest Service, Tina Terrell, in her official capacity as Forest Supervisor for the
Sequoia National Forest ("Ms. Terrell"), and Abigail R Kimbell, in her official capacity as Chief of the United States Forest

28 Service (collectively "USFS").

failure to take a "hard look" at the environmental impacts of the re-issuance; (3) the National Forest Management Act ("NFMA"), 16 U.S.C. §§1600-1687, because the SUP fails to comply with California resource and environmental law (third cause of action); and (4) NFMA, because the SUP fails to comply with Sequoia National Forest Land and Resource Management Plan ("Forest Plan"), which requires compliance with the water quality standards of the Clean Water Act, 33 U.S.C. §§1251-1387 (fourth cause of action). [2]   The parties filed cross-summary judgment motions, arguing that based on the administrative record and the law, each is entitled to judgment as a matter of law.  Having considered the record and the parties' arguments, this Court finds that although the USFS did not violate the NFMA substantively, it violated NEPA by failing to consider requests to include a minimum bypass flow restriction in the SUP or to require monitoring devices to be installed.  Accordingly, this Court GRANTS in part and DENIES in part the parties' cross-summary judgment motions and REMANDS this action to the USFS for further consideration.

## BACKGROUND

### Fay Creek

Fay Creek is a tributary of the South Fork of the Kern River, located at the southern end of the Sierra Nevada Mountain Range.  Fay Creek supports a variety of ecosystems and resources, including riparian habitat important to trout, wild flowers and grasses, and willow, alder, and cottonwood trees.  Administrative Record ("AR") at 19. Fay Creek also serves as the primary drinking water source for many wildlife species in the area. *Id*.

### Diversion

In 1890, a water diversion was created in lower Fay Creek, approximately 1/8 mile north of Quarter Circle Five Ranch owned by Sellers.  The dam and diversion are located within the Sequoia National Forest, approximately 500 feet north of the Forest's southern boundary with the Quarter Circle Ranch.  Since at the late Nineteenth Century, water has flowed from Fay Creek to the Sellers' ranch through this diversion.  The original diversion structure was replaced approximately 30-50 years ago.

The current water diversion structure uses concrete and part of a large rock outcrop to create a

---

[2] Sequoia Forestkeeper withdrew its fifth and sixth causes of action in its motion for summary judgment.

small dam approximately 12 feet high and 8 feet wide.  AR at 582.  The dam is built in a narrow, bedrock-controlled stream channel in Fay Creek, and is tied to a natural rock outcrop that has partially dammed Fay Creek and created a small waterfall.  AR at 186.  The diversion "dams up the entire stream channel."  AR at 145.  The dam and rock outcrop have created a small pond in Fay Creek that backs up the water approximately 30 feet.  Elevated piping runs from Fay Creek's small dam across a dry hillside to the Quarter Circle Five Ranch.  The diversion pipe, 6-10 inches in diameter, is two feet below the top of the spillway.  AR at 582.  At the base of the dam is a valve which is designed to allow water to pass through the dam. AR at 129.

### History of SUP and Water Permit

The water diversion structure came under the province of the USFS in 1967.  In that year, the USFS granted the first SUP for operation of the dam to divert water to Quarter Circle Five Ranch. Seller's predecessor diverted water from Fay Creek from 1967 to 1973 by permission from the USFS.

In 1973, the State of California ("State") granted the owner of Quarter Circle Five Ranch a Water Diversion and Use Permit (#S008264) ("water permit").  AR at 56-58.  The permit was granted under a claim of riparian right for water diverted from the creek for use on the ranch.

In 1983, the ranch, SUP, and water permit were transferred to Sellers.  AR at 385-86, 388-94. The USFS re-issued an SUP to Sellers in 1989, and again in 2003.  AR at 397-404, 406-15.  The 2003 SUP is the subject of this action.

### 2003 SUP Notice and Comment

On January 28, 2002, the USFS sent out a public notice that it was considering a re-issuance of the Sellers SUP. AR at 1.  The notice reads, in pertinent part:

> The Quarter Circle 5 Ranch was granted water rights from the State of California in 1973 to remove 0.129 cubic feet per second (CFS) of water from Fay Creek.  The permitted area for the Quarter Circle 5 Ranch diversion covers approximately .015 acres.  The decision to be made is whether there are extraordinary circumstances, or conditions associated with the proposed actions, which may significantly affect the environment. If no extraordinary circumstances are identified, a project file and Decision Memorandum will be completed as required in FSH 1905.15 chapter 31.2 (9/21/92).  If extraordinary circumstances are identified, the decision will be made to prepare an environmental assessment or environmental impact statement based on the significance of the environmental effects.

*Id*.  The USFS received public comment on the proposed re-issuance, including two comment letters in

support of the action, two letters with no comment, and four opinion letters opposed to the re-issuance of the SUP, unless conditions were included to ensure minimum flow or water quality. AR at 14-26. The USFS contends that it considered all of the public comments on the proposed action, including information provided after the public comment period had experience.

The USFS put together an interdisciplinary team to determine whether extraordinary circumstances existed to justify an EA or EIS on the re-issuance of the Sellers' SUP. AR at 143-50. All members of the interdisciplinary team concurred that extraordinary circumstances did not exist. *Id.*

In addition, the USFS reviewed information supplied by the State Department of Fish and Game. Stanley Stephens ("Mr. Stephens"), a senior biologist with the California Department of Fish and Game, wrote the USFS a letter in which he expressed concern over the Fay Creek diversion.  In the December 31, 2002 letter, Mr. Stephens offered that, in his opinion, "allowing the complete de-watering of Fay Creek on the relatively short reach of national forest lands not only affects the fish, wildlife, and plants there on federal lands, but also on a much longer reach of Fay Creek downstream of the Forest boundary on private lands." AR at 124.  Mr. Stephens recommended that the USFS "include language in the permit that requires the owner and operator of the dam to bypass adequate flows at all times to keep downstream resources in good condition." *Id.*  Mr. Stephens also requested that the USFS study the potential adverse environmental affects of the SUP through an EIS.  Mr. Stephens suggests that the USFS "incorporate criteria or conditions in the reissued Use Permit to minimize or eliminate the impacts of the diversion structure and reduction in flow." *Id.*  In addition, Mr. Stephens requested the USFS to address the issue of sediment management at the Fay Creek diversion. *Id.*

The USFS responded to the State Department of Fish and Game as follows, in pertinent part:

> As you know, the diversion and a portion of the water transmission line are located on public land.  We will be issuing a new special use permit to Mr. Sellers that will set forth conditions for the use of the diversion and water transmission line on National Forest System land.  For example, Mr. Sellers is responsible for maintaining the structures in good repair.  The Forest Service will contact Mr. Sellers to ensure that the recently discovered leakage in the water transmission line has been repaired.  We do not have authority to put conditions on his water rights as your staff recommends.   We are forwarding your fax and its attachments, as well as Senior Biologist/Supervisor Stanley Stephens' letter to...the State Water Resources Control Board, Division of Water Rights, Compliant Unit[.]

AR at 132-33.

4

### Sellers' Commercial Water Sales and Neighbors' Concerns

In mid-2001, Sellers' neighbors began to express concerns to authorities over Sellers' use of Fay Creek. Sellers' neighbors saw commercial water trucks coming from Sellers' ranch, and believed that Sellers was selling commercially the water diverted from Fay Creek. Sellers' neighbors were opposed to his commercial spring water operation, and wrote to the difference State and local county officials requesting an investigation. AR at 92-98. In addition to the commercial water sales issue, the neighbors expressed concerns about the safety of the large water trucks frequently driving on the narrow road near their homes. The neighbors, *inter alia*, wrote a complaint regarding the Fay Creek diversion to the California Water Resources Control Board, claiming that the quantity of water diverted by Sellers adversely affects the public trust resources of the State. In a July 18, 2001 opinion letter, California Water Resources Control Board, Division of Water Rights, explained that it had investigated the neighbors' claims. AR at 51. The opinion letter notes that Sellers' predecessor was granted a water permit in 1973 for riparian rights to the Fay Creek water. *Id*. The opinion further notes:

> Water under this statement is used to irrigate 200 acres or less of pasture/crops/domestic gardens and for stockwatering 400 head or fewer of cattle. Water is diverted at an average rate of approximately 325 gallons per minute, with total annual use averaging 110 acre-feet. Given the conditions described herein, it is presumed that Mr. Sellers is exercising a valid riparian right to the water from Fay Creek for use on his ranch.

*Id*. The opinion concluded that there was insufficient evidence "to justify action against the Ranch or Mr. Sellers." *Id*. at 52. The State Water Resources Control Board referred Sellers' neighbors to the California Department of Fish and Game to gather evidence, if any, to justify a termination or modification of Sellers' water permit. *Id*.

In mid-2002, Sellers' neighbors expressed concerns to the USFS regarding its proposed re-issuance of the SUP. The Sequoia District Ranger responded to the neighbors concerns and investigated the allegation that Sellers was selling water from Fay Creek. In the investigation, the District Ranger discovered that the water Sellers was selling came from natural springs located on Sellers' property, and did not involve the Fay Creek dam diversion. AR at 113, 118-19. Accordingly, the District Ranger advised Sellers' neighbors that the USFS had no authority over water rights issued to Sellers by the State, and advised them to approve the California State Water Resources Board. AR at 100-106.

The District Ranger forwarded copies of the neighbors' correspondence to the State Water

1    Resources Board.  The State Water Resources Board addressed the neighbors' concerns by letter:

2        [The District Ranger] has indicated that the District is planning to issue the Ranch a
         special use permit.  This permit is not related to the diversion for bottled water purposes,
3        but would instead allow the Ranch to transport water from Fay Creek over Forest Service
         land, under an existing claim of water right, for the purpose of irrigation, stockwatering,
4        and domestic use.

5        Please be advised that the U.S. Forest Services' special use permit does not convey a
         legal basis upon which to divert and/or appropriate water, but grants the permittee access
6        to and use of Forest Service land in accordance with the terms and conditions of the
         permit.  Any diversion of water, regardless of its point of origin, must have a legal basis
7        of right pursuant to California water law.

8    AR at 134-35.

9                                      **2003 SUP**

10       On February 28, 2003, Cannell Meadow District Ranger Judge Schutz issued a Decision

11   Memorandum ("Decision Memo") recommending that the Sequoia National Forest Supervisor issue a

12   ten-year SUP to Sellers for the Fay Creek Diversion.  AR at 143.  The Decision Memo reported that

13   "[n]o extraordinary circumstances were identified during scoping as potentially having effects, which

14   might significantly affect the environment.  Input from both internal and external scoping was used in

15   designing and modifying the proposal." AR at 147.  The Decision Memo concluded that the SUP "may

16   be categorically excluded from documentation" in an EA or EIS because it was a "continuation of minor

17   special uses of National Forest System lands that requires less than five contiguous acres of land (FSH

18   1909.15 Chapter 31.2).  *Id*.   The Decision Memo also concluded that re-issuance of the SUP "is

19   consistent with the Sequoia Land Management Plan, the Mediated Settlement Agreement, and Sierra

20   Nevada Forest Plan Amendment...The project is consistent with all categories of the National Forest

21   Management Act." *Id*.  The Decision Memo recommended to re-issue the SUP.  Forest Supervisor

22   Arthur L. Gaffrey approved the Decision Memo and authorized the SUP on September 15, 2003, and

23   the Seller's SUP was re-issued.  AR at 412.

24       The 2003 SUP authorizes Sellers to use or occupy National Forest System lands for "water

25   transmission and diversion of domestic and irrigation water." AR at 406.  Sellers pays $30 per year for

26   the rights granted by the SUP.  *Id*.

27                                    **Disputed Facts**

28       The parties dispute whether Fay Creek flows continuously throughout the year, or whether Fay

                                            6

1   Creek is an intermittent creek.  There is evidence that in some years, water has flowed year round,

2   whereas in most years, the creek does not flow beyond the diversion in summer months.  The parties

3   dispute whether Fay Creek may be classified as a "fishery" or a "navigable water."  The amount of water

4   diverted is also disputed.  Sellers is permitted to divert 0.129 cubic feet per second (cfs), which is about

5   one gallon per second, yet it has been estimated that as much as 325 gallons per minute (over five times

6   as much) is diverted to Sellers, with a total annual use averaging 110 acre feet.  The parties also dispute

7   the nature of the habitat, if any, in Fay Creek beyond the diversion.  The parties interpret differently the

8   findings of multiple studies of Fay Creek, included in the administrative record.  These studies include

9   a 1987 study, 1988 study, a 1997 study, and various reports made by the interdisciplinary team the USFS

10  put together in 2002.  These disputed facts form the basis of Sequoia Forestkeeper's claims.

## DISCUSSION

### Sovereign Immunity and Statute of Limitations

13      The USFS argues that this Court lacks subject matter jurisdiction over Sequoia Forestkeeper's

14  action, because it is barred by the statute of limitations, and therefore, the government's sovereign

15  immunity.  This Court must consider this threshold issue before addressing the merits of Sequoia

16  Forestkeeper's claims. *Steele Co. for Citizens for a Better Env't.*, 523 U.S. 83, 94-95 (1998).  In

17  considering a motion to dismiss for lack of subject matter jurisdiction, the plaintiff, as the party seeking

18  to invoke the court's jurisdiction, always bears the burden of establishing subject matter jurisdiction.

19  *Tosco Corp. v. Communities for Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001).  The court

20  presumes a lack of subject matter jurisdiction until the plaintiff proves otherwise.  *See Kokkonen v.*

21  *Guardian Life Ins. Co. of America*, 114 S.Ct. 1673, 1675 (1994).

22      Sequoia Forestkeeper asserts claims against the USFS pursuant to the APA.  The APA waives

23  the federal government's sovereign immunity for suits by persons who have been "adversely affected

24  or aggrieved" as a result of agency action. 5 U.S.C. §702.  Pursuant to 28 U.S.C. 2401(a), however, suits

25  against the United States "shall be barred unless the complaint is filed within six years after the right first

26  accrues."  This six-year statute of limitations applies to actions for judicial review under the APA. *Wind*

27  *River Mining Corp. v. United States*, 946 F.2d 710, 712-13 (9th Cir. 1991).

28      In an APA action, the six-year statute of limitations begins when the final agency action issues.

1   5 U.S.C. §704; *Crown Coat Front Co. v. United States*, 386 U.S. 503 (1967).  The USFS contends that

2   the final agency action was made on February 28, 2003.  Because this action was not filed until March

3   2, 2009, the USFS concludes that the action is untimely.  For the following reasons, the USFS's statute

4   of limitations arguments fails.

5       The USFS argues that the February 28, 2003 Decision Memo was the final agency action.  "To

6   determine when an agency action is final," the Court considers, inter alia, "whether its impact is

7   sufficiently direct and immediate and has a direct effect on...day to day business." *Franklin v.*

8   *Massachusetts*, 505 U.S. 788, 796 (1992) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)).

9   "An agency action is not final if it is only the ruling of a subordinate official or tentative." *Id.* at 796-97.

10  "The core question is whether the agency has completed its decisionmaking process, and whether the

11  result of that process is one that will directly affect the parties." *Id.*

12      Applying the applicable legal standards, the February 28, 2008 Decision Memo was not a final

13  agency action.  The February 28, 2003 Decision Memo was a "Proposed Action and Decision" to re-

14  issue the SUP to Sellers.  AR at 143.  The Decision Memo was signed by the Sequoia District and

15  provided a recommendation to re-issue the SUP.  The first sentence of the Decision Memo reads: "I have

16  decided to recommend to the Forest Supervisor that a ten-year Special-Use authorization be reissued[.]"

17  The Decision Memo includes a "proposed action" to be implemented in the future, after approval by the

18  Forest Supervisor.  The Decision Memo contemplates that the "planned issue date for these permits is

19  in March , 2003."  Thus, the plain language of the Decision Memo makes clear that it is not a final action

20  to have an immediate and direct impact.  Indeed, the SUP was not re-issued until September 15, 2003,

21  when the permit was approved by the Forest Supervisor. AR at 415.  Thus, the February 28, 2008

22  Decision Memo lacked finality, because it was a proposed action, written by a "subordinate" to the

23  Forest Supervisor, that had no immediate effect.  The SUP took immediate effect once it was approved

24  by the Forest Supervisor on September 15, 2003.  Accordingly, the statute of limitations began to accrue

25  at the time the SUP was re-issued, which was the final agency action. *See Forest Guardians v. United*

26  *States Forest Serv.*, 370 F. Supp. 3d 978, 985 (D. Ariz. 2004 ) ("When the special use permit was

27  issued...[plaintiff's] cause of action accrued"); *see also, Franklin v. Mass.*, 505 U.S. 788, 796-97 (1992)

28  ("An agency action is not final if it is only the ruling of a subordinate official, or tentative[.]").  Because

1  the statute of limitations began to accrue on September 15, 2003, this action that was filed on March 2,

2  2009 is timely.

3  **Documents Beyond Administrative Record**

4  In its summary judgment motion, Sequoia Forestkeeper submits, and relies on, documents

5  outside of the administrative record.  Sequoia Forestkeeper submits the declarations of Michael

6  Klinkenberg, Ara Marderosian, Harold Simolke, and Daniel Christenson.  Sequoia Forestkeeper also

7  submits several documents attached as Exhibits A through F.

8  Sequoia Forestkeeper does not explain how this Court can consider these extra-record documents

9  in its motion.  In an administrative review of an agency action, however, the Court generally restricts its

10  review to the administrative record. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d

11  930, 943 (9th Cir. 2006).  The Court reviews "the full administrative record that was before the

12  [decision-maker] at the time he made his decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*,

13  401 U.S. 402, 420 (1971).; 5 U.S.C. §706.  The Court "normally refuse[s] to consider evidence that was

14  not before the agency because 'it inevitably leads the reviewing court to substitute its judgment for that

15  of the agency.'" *Id*. (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1152, 1160 (9th Cir. 1980)).  The Court may

16  permit submission of extra-record materials only in limited circumstances, including: (1) if it is

17  necessary to determine "whether the agency has considered all relevant factors and has explained its

18  decision," (2) "when the agency has relied on documents not in the record," (3) "when supplementing

19  the record is necessary to explain technical terms or complex subject matter"; or (4) where there is an

20  allegation of bad faith. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th

21  Cir. 1996) (citations omitted).

22  In its motion for summary judgment, the USFS moved to strike the documents Sequoia

23  Forestkeeper submitted and relied on outside of the administrative record.  The USFS argues that these

24  documents are immaterial, and do not meet any of the factors required to submit extra-record

25  information.  The USFS points out that these exhibits are documents that did not exist at the time the

26  decision was made to re-issue the Sellers SUP in 2003, and submits that Sequoia Forestkeeper cannot

27  attempt to supplement the record seven years after the decision was made to add new information.  This

28  Court agrees. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("Were the federal

courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making.  Here, the risks presented by the supplemental evidence are serious[.]").  Moreover, Sequoia Forestkeeper apparently concedes that it submitted the extra-record documents without authority, as it failed to address the USFS' motion to strike in its opposition to the USFS' motion for summary judgment.  Accordingly, this Court STRIKES the declarations and exhibits submitted by Sequoia Forestkeeper, and considers only the administrative record in these cross-motions for summary judgment.

**Standards to Review Merits of Plaintiffs claims**

Sequoia Forestkeeper asserts that the re-issuance of the SUP violated NEPA (counts one and two) and NFMA (counts three and four).  Alleged violations of NEPA and NFMA are subject to juridical review under the APA. *Blue Mtn. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).  This Court reviews an agency's actions pursuant to the APA under two standards.  *Price Rd. Neighborhood Ass'n. v. United States DOT*, 113 F.3d 1505, 1508 (9th Cir. 1997).

For disputes that are primarily factual, this Court "shall...set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or found to be "without observance of procedure required by law." 5 U.S.C. §706(2).  Although the Court's review is "searching and careful," the "standard is narrow." *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005).  The arbitrary and capricious standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision."  *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotations and citations omitted).  Under such deferential review, the Court may not substitute its judgment for that of the agency. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989); *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).  Thus, the Court will not vacate an agency's decision under the "arbitrary and capricious" standard unless the agency:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the produce of agency expertise.

1   *Nat'l Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle*

2   *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  On the other hand, a reviewing

3   court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

4   *Id*. (quotations and citations omitted).

5        When a dispute is primarily legal in nature, or concerns a threshold question of law, this Court

6   applies the more lenient "reasonableness" standard. *Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water*

7   *Supply*, 295 F.3d 955, 959 (9th Cir. 2002).  "[W]here an agency has decided that a particular project does

8   not require the preparation of an EIS, without having conducted an environmental assessment, and [the

9   court is] dealing with primarily legal issues that are based upon undisputed historical facts," then the

10  Court applies a "reasonableness" standard. *Id*.  Under this standard, the Court will uphold the agency's

11  decision unless it is unreasonable. *Friends of the Earth v. Hintz*, 800 F.3d 822, 836 (9th Cir. 1986).

12       The USFS asserts that this Court should apply the more stringent "arbitrary and capricious"

13  standard to its review of the USFS decision to re-issue the SUP.  Sequoia Forestkeeper apparently

14  concedes that this is the applicable standard, as Sequoia Forestkeeper leaves unaddressed the

15  reasonableness standard, and argues that the USFS's decision was "arbitrary and capricious."  Although

16  this dispute is less factual than a dispute in which an EA or EIS is prepared, the "historical fact" upon

17  which the SUP Memo Decision was based are not undisputed.  The issues of this action are factual and

18  legal in nature.; i.e., whether Fay Creek is a fishery or a navigable water, and how much water flows

19  through the diversion.  Accordingly, this Court shall apply an "arbitrary and capricious" standard to its

20  review of factual issues, but will consider pure questions of law under the reasonableness standard.

21                                            **NFMA Claims**

22       The parties begin their arguments with Sequoia Forestkeeper's NFMA claims.  In its third cause

23  of action, Sequoia Forestkeeper argues that the SUP violates the NFMA, because it fails to comply with

24  California resource and environmental law.  In the fourth cause of action, Sequoia Forestkeeper asserts

25  that the re-issuance of the Sellers SUP violates NFMA, because it fails to comply with the Sequoia

26  Forest Plan, which requires compliance with the water qualify standards of the Clean Water Act, 33

27  U.S.C. §§1251-1387 ("CWA").

28       The Court reviews narrowly a challenge to a USFS decision pursuant to NFMA.  In *Lands*

*Council v. McNair*, the Ninth Circuit clarified a federal court's review of the actions of the USFS. 537 F.3d 981, 984 (9th Cir. 2008) (en banc). As set forth above, the review pursuant to the "arbitrary and capricious" standard is narrow, and this Court shall not substitute its judgment for that of the agency. A federal court grants "the Forest Service the latitude to decide how best to demonstrate that its plans will" satisfy the goals of the forest plan and NFMA. *Id*. at 992. This Court "defer[s] to the Forest Service as to what evidence is, or is not, necessary to support" its analysis. *Id*. The Court's "proper role is simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious." *Id*. at 993. Accordingly, this Court:

> look[s] to the evidence the Forest Service has provided to support its conclusions, along with other materials on the record, to ensure that the Service has not, for instance, relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 987 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotations omitted).

### Whether USFS Violated NFMA by Failing to Specify Minimum Flows in the SUP

Pursuant to NFMA, the USFS develops a land and resource management plan, or Forest Plan, for each national forest which directs how each forest must be managed. *See* 16 U.S.C. §§1604(a); 1604(f), 1604(i); 36 C.F.R. §251.54(e)(1)(ii). After a Forest Plan is developed, "all subsequent agency action, including site-specific plans such as the [re-issuance of the SUP] must comply with the NFMA and be consistent with the government plan." *Lands Council*, 537 F.3d at 989 (citing 16 U.S.C. §1604(f))*; see also, Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act.").

The Sequoia Forest Plan governs Fay Creek. Pursuant to the Sequoia Forest Plan, the USFS must "[p]rotect fishery streams by specifying minimum flows necessary to maintain fisheries habitat and allowing removal of no more than 50 percent of the flow at any time." AR at 245. Sequoia Forestkeeper argues that the USFS erred not to specify minimum flow requirement in the Sellers' SUP because Fay Creek is a fishery. The USFS contends that it was not required to include minimum bypass flows in the

SUP because Fay Creek is not "fishery habitat" below the dam and diversion structure.

The USFS concluded that the portion of Fay Creek below the diversion did not constitute a fishery. The parties agreed that this conclusion was based on a September 16, 2002, "Fisheries and Watershed Analysis" of the water diversion, prepared by Teresa Tharalson, Zone Fisheries Biologist, Acting Zone Hydrologist ("Fisheries Analysis). AR at 201-19. The Fisheries Analysis reviewed the past Fay Creek surveys to conclude: "Fay Creek has a permanent fishery above the diversion structure, but not below it." AR at 206. The relevant portion of the Fisheries Analysis reads:

> Fay Creek does have a fishery above the water diversion structure. This stream has been surveyed three times, usually in the upper reaches. A 1988 fishery survey found fish in Fay Creek above the water diversion structure.

> A 1975 fishery survey (Boyer et al., 1975) found that Fay Creek was dry below the diversion structure and there was little water in Fay Creek upstream of the Quarter Circle 5 Ranch. The surveyors wrote that they doubted that Fay Creek had a fishery in the lower reaches and that they also doubted Fay Creek could sustain a significant fishery (*ibid*.).

> A 1988 fishery survey found fish below True Meadow downstream past the Forest boundary, almost to the Quarter Circle 5 Ranch (Knotts, 1988). In this survey, the fish identified as being either rainbow trout, or rainbow-golden trout hybrids...were seen in the upper, middle, and lower reaches of Fay Creek. Fish identified as Sacramento suckers were seen only in the lower reaches, below a long series of natural fish barriers. The presence of trout above the natural fish barriers in Fay Creek indicates that the fish were likely stocked in the upper reaches of this stream; then these fish spread into the downstream reaches of Fay Creek.

> A 1997 fishery survey found trout in the upper reaches of Fay Creek from below True Meadow to where FS road 22S12 crosses Fay Creek (Tharalson, 1997). The trout were not positively identified, but they did have strong par marks on their sides and white tips on their fins; indicating that these fish were either native trout or native-introduced trout hybrids. The 1997 survey went from just below road 22S12 upstream to True Meadow and Long Meadow, so only in the upper reaches was the presence of fish in the [sic] or absence of fish in the middle and lower reaches was not documented in that survey.

> Fay Creek has a permanent fishery above the diversion structure, but not below it. Even if the lower reaches of Fay Creek loose [sic] much of their surface flow and the water gets over 75 F. during the summer, suckers can survive in dep bedrock pools that retain permanent surface water.

AR at 205-06. As to the effects of the diversion on "sensitive fisheries and riparian species," the Fisheries Analysis concluded: (1) there would be no effect on certain species; (2) most of the effect on certain species would have occurred in 1890 when the diversion was first built; and (3) the effects on species downstream from the diversion is unknown. As to the last conclusion, the Fisheries Analysis concluded:

13

> The diversion of 0.129 cubic-feet-per-second (cfs.) of surface water has lessened the amount of habitat in downstream areas for these species by the loss of downstream water in Fay Creek. The amount of habitat loss is unknown because there is no information on what this stream was like before 1890. Given the amount of water diverted (0.129 cfs.), and that there is not a defined channel all the way to the South Fork Kern River (Fay Creek flows through old alluvial deposits in its lower reaches); it is likely that without the present diversion structure that Fay Creek would not flow much further than it does presently.

AR at 207. The Fisheries Analysis also concluded that renewal of the Sellers' SUP "would have no additional effect [on] any [general] fisheries or riparian habitat in their areas because the current diversion structures have been in place for over thirty years and are currently stable." AR at 207. Acknowledging that the USFS must issue an SUP that complies with the CWA, the Fisheries Analysis provides:

> The past and current terms in the Special Use Permits for these diversion structures already address the permit-related Fisheries and Watershed issues that are within the Forest Service's jurisdiction. The permit terms already specify that the structures have to be kept in good repair, that the removal of any vegetation on Forest Service land would need prior approval, and that repair, modification, or replacement of the diversion structures on Forest Service land would need to be reviewed and approved by the Forest Service.

AR at 208.

The Sequoia Forest Plan defines "fishery habitat" as "[s]treams, lakes, and reservoirs that support fishes." The Forest Service Manual defines cold water fisheries as "aquatic habitats" that "predominantly support" particular fish species. AR at 777 (this document is submitted outside of the administrative record). "Aquatic habitat" is defined as "environments characterized by the presence of standing or flowing water." The terms "predominantly" and "support" are not defined.

Sequoia Forestkeeper argues that the USFS's conclusion that Fay Creek is a fishery above the water diversion but not below it was arbitrary and capricious. Sequoia Forestkeeper contends that "historical Forest Surveys establish Fay Creek is fishery habitat, that the Forest Service considered the lower reaches to be fishery habitat, and that there were no facts to support the Forest Service's 2002 change of heart regarding categorization of the lower reaches."

Sequoia Forestkeeper contends that this Court should not defer to the USFS's conclusion that Fay Creek does not constitute a fishery below the diversion because the facts do not support this conclusion. Sequoia Forestkeeper relies on the 1988 survey that characterizes Fay Creek as a coldwater

14

fishery to support its position.  Sequoia Forestkeeper argues that the 1988 survey concludes  that the "entire creek constitutes fishery habitat," including the lower portion of the creek downstream from the diversion.  Sequoia Forestkeeper faults the 2002 Fisheries Analysis for emphasizing the 1975 survey that concluded that it is "doubtful" that Fay Creek contained "significant" fishery habitat below the diversion, and claims that the 2002 report "conspicuously omitted the fact that as a result of the of the 1988 survey the Forest Service categorized Fay Creek as a "cold-water fishery in good condition.  Sequoia Forestkeeper contends that USFS's conclusion that it was not a fishery below the diversion was contrary to the facts in the record.

Sequoia Forestkeeper mischaracterizes the import and conclusions of the 1988 survey.  The 1988 survey was conducted after a forest fire in the area.  The objective of the survey was "to determine and assess the effects of the Fay Fire on the watershed and fisheries."  AR at 152.  The 1988 acknowledged that the 1975 survey concluded that Fay Creek was found to have too low a flow to support a viable fishery and served as a drainage channel.  The 1988 survey explained that "from a fisheries standpoint, Fay Creek is in good condition."  Significantly, however, the 1988 survey also concluded:

> In addition, there is little evidence of there ever being enough water to support a resident fishery year round.  The abundance of water in 1988, can probably be linked to the lost of evapotranspirators (trees) after the Fay Fire had burned through.  The lack of these natural "pumps" has increased the flow of overland water while decreasing that lost to evaporation.

AR at 153.  Thus, the 1988 survey recognizes that the water flow and the conditions of the creek in 1988 were unusual.  Even with the unusually high flow of water, the 1988 survey recommended that "Fay Creek be left in its present state to recover naturally" because of "the low water flows." *Id*.  Moreover, the 1988 survey's conclusions do not state explicitly that it found fish below the diversion, or that it believed the area below the diversion to be a fishery.  Although the 1988 survey discussed the upper, middle, and lower portions of Fay Creek, the 1988 survey does not distinguish the lower portion of the creek upstream and downstream from the diversion.  In addition, the 1988 survey characterized the lower portion of Fay Creek to be "poor-habitat limited" for species reproduction, and described the stream flow condition to be "low," even in that year of abundant water.  Thus, the 1988 survey does not establish conclusively that in 2002 the portion of Fay Creek below the diversion constitutes a fishery, as Sequoia Forestkeeper represents.

1    Moreover, Sequoia Forestkeeper's argument ignores other evidence in the administrative record

2    that supports the USFS's conclusion.  Sequoia Forestkeeper focuses on the 1988 survey to the exclusion

3    of all other evidence available to the USFS at the time it made its decision.  Sequoia Forestkeeper argues

4    that the USFS's conclusion is contrary to the facts, yet the 1974 survey considers that the Fay Creek is

5    not a fishery and would not support an aquatic habitat.

6    The USFS's determination that Fay Creek was not a fishery below the diversion was supported

7    by the administrative record.  The 2002 Fisheries Analysis, prepared by a USFS Acting Zone

8    Hydrologist, considered all of the surveys of Fay Creek.  The conclusion is consistent with earlier

9    surveys that while fish may have been present from time to time in the lower reaches of Fay Creek, the

10    conditions, natural barriers, and low water flow of Fay Creek did not support an aquatic environment

11    that "predominantly supports" fish year-round.  In addition, letters provided to the USFS by longtime

12    residents of Fay Creek downstream of the diversion affirmed that Fay Creek typically "goes dry around

13    July 4th and does not start again until Labor Day or later." AR at 49, 97.  Accordingly, the USFS

14    conclusion that the area below the diversion was not a fishery was not arbitrary and capricious, as it

15    relied on the expertise of its hydrologist/biologist and was supported by the historical data.

16    The Sequoia Forest Plan requires the USFS to "[p]rotect fishery streams by specifying minimum

17    flows necessary to maintain fisheries habitat and allowing removal of no more than 50 percent of the

18    flow at any time." The NFMA requires the USFS to comply with its Forest Plan.  Because the USFS's

19    conclusion that the portion of Fay Creek below the diversion was not a fishery, the USFS was not

20    required to specify minimum flows in the SUP.  Accordingly, the USFS did not violate the NFMA by

21    failing to require minimum flow restrictions in the 2003 Sellers' SUP.

22    **Whether USFS Violated NFMA by Failing to Demand a 401 Certificate**

23    Sequoia Forestkeeper argues that the USFS violated the CWA because it issued the SUP without

24    requiring State certification that the diversion would not impact water quality in Fay Creek.  The NFMA

25    requires the USFS to comply with the CWA, among other statutes.  The Sequoia Forest Plan has a goal

26    to "[p]rovide the technical services needed to comply with water quality goals as specified in the Clean

27    Water Act."

28    Section 401 of the CWA requires every applicant for a federal license or permit which may result

16

in a discharge into "navigable waters" to provide the licensing or permitting federal agency with certification that the project will be in compliance with specified provisions of the CWA, including State water quality standards ("Section 401 Certificate").  No 401 Certificate was issued by the State before the 2003 SUP re-issued.  Sequoia Forestkeeper argues that USFS's failure to require Sellers to obtain a Section 401 Certificate from State was arbitrary and capricious, and violated the NFMA.

The USFS points out that a Section 401 Certificate is required when a permit is issued which may result in a discharge into "navigable waters."  The USFS argues that Fay Creek is not a navigable water, because it is a shallow, rock-filled creek which, in stretches below the dam, goes underground and historically runs dry for several months of the year.

The term "navigable waters" is defined as "the waters of the United States, including the territorial seas." 33 U.S.C. §1362(7).  The USFS interprets this definition narrowly, suggesting that Fay Creek must be navigable-in-fact to fall within the CWA. Sequoia Forestkeeper defines the term broadly, arguing that Fay Creek is a navigable water within the meaning of the statute. Sequoia Forestkeeper fails to consider the most recent and controlling United States Supreme Court or Ninth Circuit interpretations of the term "navigable waters," and the USFS misinterprets it.  Accordingly, this Court first considers the appropriate interpretation of the term "navigable water," then determines that Fay Creek does not fall within the definition.

In *Rapanos v. United States*, 547 U.S. 715 (2006) the Supreme Court interpreted the term "navigable waters" as used in the CWA in a 4-4-1 plurality opinion.  The Court unanimously agreed that the term navigable waters was not to be interpreted narrowly to require navigability-in-fact.  The Court further agreed, however, that the term should not be applied as liberally as Sequoia Forestkeeper implores.  The USFS relies on a four justice plurality, which ruled:

> the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of the "the waters of the United States" is thus not "based on a permissible construction of the statute.

*Id*. at 732 (citations omitted).  This definition of "navigable water" may appear to exclude Fay Creek, because the evidence demonstrates that Fay Creek is not a "continuously flowing" body of water, and

has been described as a channel to provide drainage for rainfall.  As the plurality explained, however: "By describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We also do not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months . . . ." *Id*. at 733 n.5.  Considered further under this analysis, Fay Creek may qualify as a navigable water.  Indeed, Sequoia Forestkeeper argues that even "intermittent streams" qualify as such.

As the Ninth Circuit recognized in *N. Cal. River Watch v. City of Healdsburg*, 457 F.3d 1023, 1029 (9th Cir. 2006) and *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007), however, Justice Kennedy's opinion is the "controlling rule of law."  In his opinion, Justice Kennedy held that one must establish a "significant nexus" between wetlands and navigable waters to apply the CWA to the wetlands.  *See also, United States v. Gerke Excavating, Inc*., 464 F.3d 723 (7th Cir. 2007) (adopting Justice Kennedy's "significant nexus" test as the rule of law).  Justice Kennedy explained that:

> wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'

547 U.S. at 780.

Sequoia Forestkeeper relies on *Moses* for its position that even an intermittent stream can constitute a navigable water of the United States.  In *Moses*, the Ninth Circuit considered "whether a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States." *Id*. at 989.  The Ninth Circuit recognized pre-*Rapanos* case law that ruled that "even tributaries that flow intermittently are 'waters of the United States." *Id*. (quoting *Headwaters, Inc. v. Talent Irrigation Dist*., 243 F.3d 526, 534 (9th Cir. 2001).  The Ninth Circuit's holding relied on the following analysis:

> [T]here is no reason to suspect that Congress intended to exclude from "waters of the United States" tributaries that flow only intermittently. Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . . Rather, as long as the tributary would flow into the navigable body of water "during significant rainfall," it is capable of spreading environmental damage and is thus a "water of the United States" under the Act.

1   496 F.3d at 989 (quoting *United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir. 1997) (citations and

2   footnote reference omitted).

3       The facts of *Moses* are distinguishable from the current case. The Ninth Circuit ruled that an

4   intermittent tributary that empties into a river that is a water of the United States can be a "navigable

5   water." The "intermittent tributary" at issue in *Moses* differs greatly from Fay:

6       The man-made severance of Teton Creek at Alta, Wyoming, may have made the portion
        in question here dry during much of the year, but when the time of runoff comes, the
7       Creek rises again and becomes a rampaging torrent that ultimately joins its severed lower
        limb and then rushes to the Teton River, the Snake River, and onward to the Columbia
8       River and the Pacific Ocean.

9   496 F.3d at 991. Even in times of heavy flow, Fay Creek could not be described as "a rampaging

10  torrent." In addition, and significantly, the creek in Moses flowed interstate to join directly navigable

11  waters of the United States. Here, there is no evidence in the administrative record that Fay Creek joins

12  (or would join) a navigable water downstream.

13      This Court finds that Fay Creek is not a "navigable water" of the United States within the

14  meaning of the CWA under either *Moses* or *Rapanos*. In *Moses*, the Ninth Circuit found that a

15  "seasonally intermittent stream which ultimately empties into a river that is a water of the United States

16  can, itself, by a water of the United States." *Id*. at 989, 991. The Court interprets the *Moses* decision to

17  require a seasonal, intermittent stream to empty into a river to be defined as a "navigable water" itself.

18  The *Moses* opinion supports this Court's position, in that it recognized that an intermittent creek or

19  tributary is a navigable water "*as long as* the tributary would flow into the navigable body of water

20  during significant rainfall" and is "capable of spreading environmental damage" *Id*. at 989 (emphasis

21  added). Fay Creek does not fall within this definition, however, because it does not empty into a

22  navigable river, such as the Kern River. Similarly, and for these reasons, Fay Creek would not be

23  considered a navigable water under Justice Kennedy's "significant nexus" test, either. Pursuant to

24  *Rapanos*, Fay Creek would constitute a "navigable water" if "either alone or in combination with

25  similarly situated lands in the region, [it could] significantly affect the chemical, physical, and biological

26  integrity of other covered waters more readily understood as 'navigable.'" 547 U.S. at 780. As explained

27  above, there is no evidence that water flowing through Fay Creek effects a body of water considered

28  "navigable" in the traditional sense. The administrative record supports the USFS's position that Fay

19

Creek is not a navigable water, since its "effects on water quality are speculative or insubstantial," such that Fay Creek "fall[s] outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.*[3]

Because Fay Creek is not a "navigable water" within the meaning of the CWA, the USFS did not err for failing to require Sellers to obtain a Section 401 Certificate prior to the re-issuance of the SUP in 2003. Accordingly, the USFS's failure to require the Section 401 Certificate did not violate the NFMA.

**Whether USFS Violated the NFMA By Failing to Include Other Conditions in the SUP**

Sequoia Forestkeeper alleges that the USFS violated the NFMA by failing to condition the SUP on compliance with other goals of the Forest Plan and the CWA, including to (1) "protect streamcources and adjacent vegetation to maintain or improve overall wildlife and fish habitat, water quality, and recreational opportunities; (2) protect downstream riparian rights; (3) protect "wildlife adaptations"; (4) ensure the "beneficial uses" for Fay Creek; and (5)"[r]equire compliance with applicable air and water quality standards established by or pursuant to applicable Federal or State law."

The USFS argues that the SUP contains conditions which are appropriate to protect and meet the Sequoia Forest Plan's goals and to require compliance with environmental laws. To protect vegetation, for example, the SUP requires Sellers to "obtain prior written approval from the authorized officer before removing or altering vegetation or other resources." AR at 410. In addition, Section III of the SUP contains the following condition to require compliance with federal, state, and local laws:

> The holder shall comply with all applicable Federal, State, and local laws, regulations, and standards, including but not limited to, the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., the Comprehensive Environmental Response, Control, and Liability Act, 42 U.S.C. 9601 et seq., and other relevant environmental laws, ans well as public health and safety laws and other laws relating to the siting, construction, operation, and maintenance of any facility, improvement, or equipment on the property.

AR at 407. As to wildlife adaptations, the USFS argues that it examined in some detail the effect on

---

[3]This Court's conclusion that Fay Creek is not a "navigable water" within the meaning of the Clean Water Act is consistent with applicable regulations. Under regulatory definitions, an intermittent stream may be a navigable water only if the "use, degradation, or destruction of which would *affect or could affect interstate or foreign commerce*." 40 C.F.R.§ 122.2(c), (e); 33 C.F.R. §328.3(a). There is no evidence that Fay Creek affects interstate or foreign commerce. In addition, these regulatory definitions must comply with the rule of law as stated by the United States Supreme Court.

1   wildlife of the re-issuance of the SUP through the Fisheries Analysis, Biological Analysis, and other

2   reports, and determined that there would be no significant effect on wildlife.   Moreover, the USFS

3   points out that the above condition does require Sellers to comply with federal and State water quality

4   standards.

5         The NFMA "unquestionably requires the Forest Service to 'provide for diversity of plant and

6   animal communities...in order to meet overall multiple-use objectives.'" *Lands Council*, 537 F.3d at 992.

7   The NFMA further requires the Forest Service to implement the goals of the applicable Forest Plan.

8   "However, despite imposing these substantive requirements on the Forest Service, neither the NFMA

9   and its regulations nor the [applicable] Forest Plan specify precisely how the Forest Service must

10   demonstrate that its site-specific plans adequately provide for wildlife viability." *Id*.  Because of the

11   USFS's expertise in the area, this Court defers to its methods, and grants "the Forest Service the latitude

12   to decide how best to demonstrate that its plan will provide for wildlife viability." *Id*.

13         Sequoia Forestkeeper fails to demonstrate that the USFS acted arbitrarily and capriciously by

14   failing to condition the SUP to comply with various Forest Plan goals and environmental laws.  The SUP

15   contains a condition to require Sellers to comply with various environmental laws, including the CWA.

16   The SUP also includes an additional protection for vegetation.  The Court defers to the USFS that this

17   condition best serves the goals of the Forest Plan, especially in light of the absence of evidence that

18   Sellers has failed to comply with its provisions.  Moreover, Fay Creek is in the MC6 (Mixed Chaparral)

19   Management Area of the Sequoia National Forest.  The MC2 has a grazing of livestock emphasis in

20   mixed chaparral vegetation.  This Court defers to the USFS's balance of the multiple uses of the forest.

21   See, 16 U.S.C. § 528 ("it is the policy of the Congress that the national forests are established and shall

22   be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes.").

23   Here, the water is used for, among other things, grazing of cattle on Sellers' land.  Accordingly, the

24   USFS has not violated the NFMA by failing to include further conditions in the SUP.

25                                 **NEPA Claims**

26                                   **Introduction**

27         "NEPA requires that a federal agency consider every significant aspect of the environmental

28   impact of a proposed action and inform the public that it has indeed considered environmental concerns

in its decisionmaking process." *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1153-54 (9th Cir. 2006), *abrogated on other grounds by Winter v. NRDC, Inc.*, 555 U.S. 7 (2008).  NEPA is a procedural statute which "exists to ensure a process, not to mandate particular results." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936 (9th Cir. 2010); *see also, Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  Because the statute is procedural in nature, the reviewing court will set aside agency actions that are adopted "without observance of the procedure required by law. *Natural Res. Def. Council v. U.S. Forest Service*, 421 F.3d 797, 810 n.27 (9th Cir. 2005).

NEPA and its implementing regulations require federal agencies, including the USFS, to take a "hard look" at their actions, and to assess foreseeable environmental impacts of those actions, including direct, indirect, and cumulative impacts, in a forthright and public manner. 42 U.S.C. §4332(c)(i); 40 C.F.R. §1508.7.  If a proposed agency action would "significantly affect the quality of the human environment," then NEPA requires the agency to prepare an EIS.  42 U.S.C. §4332(2)(C).  If it is not clear whether an action will require preparations of an EIA, regulations direct the agency to prepare an EA to determine whether an EIA is required. 40 C.F.R. §1501.4(b).

An agency is not required to prepare an EIS or an ES when the proposed action falls within a "categorical exclusion" to NEPA's requirements. *See,* 40 C.F.R. §§1501.4(b), 1502, 1508.4, 1508.9.  Categorical exclusions are "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. §1508.4.  "By definition, then a categorical exclusion does not create a significant environmental effect; consequently, the cumulative effects analysis required by an environment assessment need not be performed.  That assessment has already been conducted as part of the creation of the exclusion." *Utah Envt'l Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006); *Alaska Ctr. for Env't v. U.S. Forest. Serv.*, 189 F.3d 851, 853-54 (9th Cir. 1999).  An agency may apply a categorical exclusion to its proposed action, however, only in the absence of extraordinary circumstances. *Bicycle Trails Council of Marin v. Babbit*, 82 F.3d 1445, 1456 (9th Cir. 1996); *Utah Envt'l Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008).  If "scoping indicates that extraordinary circumstances are present and it is uncertain that the proposed action may have a significant effect on the environment," then an EA must be prepared. AR at 266.

1    The USFS applied a categorical exclusion to its re-issuance of the Sellers' SUP.  The applicable

2    categorical exclusion is found in the Forest Service Handbook ("FSH") at 1909.15, Section 31.2.3, and

3    excludes from NEPA's EIS or EAS analysis "[a]pproval, modification, or continuation of minor special

4    uses of National Forest System lands that require less than five contiguous acres of land."  The FSH

5    provides "examples" of agency action that would fall into this exclusion, including "[a]pproving the

6    continued use of land where such use has not changed since authorized and no change in the physical

7    environment or facilities are proposed." *Id*. AR at 270-71.

8    Sequoia Forestkeeper's challenge to the re-issuance of the SUP pursuant to NEPA is three-fold:

9    (1) the USFS did not take a "hard look" at the environmental effects of the SUP because it erroneously

10   believed that it could not place a condition on Sellers' water rights; (2) the categorical exclusion does

11   not apply because the diversion impacts an area larger than five acres and is not minor; and (3)

12   extraordinary circumstances exists which requires either an EIS or EA.  The USFS maintains that the

13   re-issuance of the Sellers' SUP complied in full with NEPA.  The Court considers each challenge below.

14   **Whether USFS Violated NEPA by Concluding That It Had No Authority to Condition the SUP
to Affect Sellers' Water Rights**

15

16   Sequoia Forestkeeper asserts that the USFS's review of the re-issuance of the SUP was too

17   narrow due to the USFS's conclusion that it had no authority to consider Sellers' water rights.  Sequoia

18   Forestkeeper argues that this assumption was false, and that the USFS has the authority to place

19   conditions in its SUP that limits the unlimited water permit issued by State to Sellers.  The USFS

20   maintains that it has no right to interfere with state-granted water rights.  Unjustifiably, neither party cites

21   legal authority to support its position.  Accordingly, neither party has satisfied its burden to establish it

22   should be granted judgment as a matter of law on this issue.

23   Nevertheless, having considered the administrative record, applicable standards, and applicable

24   law, this Court finds that the USFS acted arbitrarily or capriciously in its determination that it did not

25   have the authority to condition the Sellers' SUP to maintain certain levels of water flow or to restrict the

26   level of flow to the amount of water granted by State in its water permit.

27   Several parties requested the USFS to consider conditioning the SUP on minimum bypass flows.

28   For example, in his letter to USFS, Mr. Stephens, State Department of Fish and Game Senior Biologist

wrote:

> While we recognize the Forest may not have the authority to appropriate water, I believe you can help ensure that proper bypass flows occur, such that downstream needs are met.  We would encourage the inclusion of language in the permit that requires the owner and operator of the dam to bypass adequate flows at all times to keep downstream resources in good condition.  I encourage you to evaluate these concerns and integrate them into your EA, EIA, and incorporate criteria or conditions in the reissued Use Permit to minimize or eliminate the impacts of the diversion structure and reduction in flow.

AR at 124.

The USFS maintained throughout its internal and external scoping process that it did not have the authority to interfere with Sellers' water rights, granted by the State, and dismissed requests to consider minimum bypass flow conditions in the SUP.  In a January 28, 2003 letter to  California Department of Fish and Game, the Forest Supervisor wrote:

> As you know, the diversion and a portion of the water transition line are located on public land.  We will be issuing a new special use permit to Mr. Sellers that will set forth conditions for the use of the diversion and water transmission line on National Forest System land.  For example, Mr. Sellers is responsible for maintaining the structures in good repair.  The Forest Service will contact Mr. Sellers to ensure that the recently discovered leakage in the water transmission line has been repaired.  We do not have the authority to put conditions on his water rights as your staff recommends.  We are forwarding your fax and its attachments, as well as [another letter from the State Department of Fish and Game] to...the State Water Resources Control Board.

AR at 132-33.  In its Decision Memo, the USFS reiterates its position that "the Forest Service cannot place any conditions in a Special-Use permit which would infringe upon a water right." AR at 143.  The Decision Memo noted that USFS "received three responses following the close of the public scoping period.  All three letters addressed water rights and/or the natural resources concerns that are outside the scope of this decision." AR at 146.

This action "is not a controversy over water rights, but over rights-of-way through lands of the United States, which is a different matter, and is so treated in the right-of-way acts before mentioned." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 411 (1917).  The SUP does not grant or alter Sellers' water rights. Section VII(E) of the SUP provides: "This authorization does not convey any legal interest in water rights as defined by applicable State law."  The SUP does not allow Sellers a right to use the water that flows from Fay Creek; rather, it grants Sellers special use of the water diversion located on Forest Service lands to transmit water from Fay Creek to his private property. Sellers' water

rights were granted by State.  Thus, the issue is not whether the USFS had legal authority to grant water rights, but whether it had the legal authority to condition the SUP to require minimum bypass flows.

Federal law, including the Federal Land Policy Management Act of 1976 ("FLMPA") "specifically authorizes the Forest Service to restrict such rights-of-way [granted by an SUP] to protect fish and wildlife and maintain water quality standards under federal law, without any requirement that the Forest Service defer to state water law." *County of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081, 1086 (9th Cir. 2003).[4]  In *Okanogan*, the Ninth Circuit rejected appellants' position that "the Forest Service does not have the authority to condition the use of the rights-of-way in a national forest on the maintenance of instream flows because such restrictions deny them their vested water rights under state law." *Id*. at 1084.  The Ninth Circuit found that the USFS has the authority to condition water rights-of-way granted through an SUP in several federal statutes:

> The Federal Land Policy and Management Act of 1976 (FLPMA) authorizes the Secretaries of the Interior and Agriculture to "grant, issue, or renew rights-of-way over" public lands for "ditches . . . for the . . . transportation . . . of water." 43 U.S.C. § 1761(a)(1). Such rights-of-way "shall contain . . . terms and conditions which will . . . minimize damage to . . . fish and wildlife habitat and otherwise protect the environment" and that will "require compliance with applicable . . . water quality standards established by or pursuant to applicable Federal or State law." *Id*. § 1765(a). In addition, the National Forest Management Act requires the Forest Service to specify guidelines for land management plans that "provide for . . . watershed, wildlife, and fish" and "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(A) & (B). The Organic Administration Act, 16 U.S.C. § 475, provides that "no national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows . . . ." The Multiple Use Sustained-Yield Act of 1960 (MUSYA), 16 U.S.C. § 528, provides that "it is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."

*Id*. at 1085.  The *Okanogan* Court considered these statutes to "give the Forest Service authority to maintain certain levels of flow in the rivers and streams within the boundaries of the Okanogan National Forest to protect endangered fish species." *Id*.; *see also*, *Diamond Bar Cattle Co. v. United States*, 168

---

[4]The parties have been considering the legal issues presented in this action for almost nine years, since the initial notice for comment issued in January 2002. This action was filed nearly two years ago, and the parties have briefed these cross-summary judgment motions over the course of four months. Despite having nearly a decade to consider these issues, and four months to brief them, the parties failed to cite controlling law on the navigable waters issue, discussed *supra*, and failed to cite *any* legal authority for this central question as to whether the USFS had the legal authority to condition the SUP to limit the amount of water flowing through the diversion. The parties' failures are egregious, particularly in light of controlling, applicable law on these issues. The Court ADMONISHES both parties that failure to set forth controlling, applicable law in future motions shall result in an order to show cause why sanctions should not be imposed.

F.3d 1209 (10th Cir. 1999) (affirming district court's finding that whether "Plaintiffs own certain water rights...does not change the fact that such rights do not deprive the Forest Service of its statutory authority and responsibility to regulate the use and occupancy of National Forest System lands."). Thus, the USFS had the authority to condition the SUP on minimum passage flow restrictions. *Accord, Trout Unlimited v. USDA*, 320 F. Supp. 2d 1090, 1106 (D. Colo. 2004) ("[P]ursuant to its regulatory authority, the Forest Service could have imposed bypass flows as a condition to the renewal of" permit to use Forest Service land.); *see also, PUD No. 1 v. Washington Dep't. of Ecology*, 511 U.S. 700, 720-21 (1994) (regulatory action under federal law to require minimum stream flows does not interfere with state water allocation because it neither "reflected nor established" a water right.").

The USFS could have also considered requests to alter the diversion to limit the flow of water to the amount granted in Sellers' water permit. Sellers is permitted to divert 0.129 cubic feet per second (cfs), which is about one gallon per second. The 2002 biological, aquatic, and environmental assessments of Fay Creek assumed Sellers diverted this amount. Yet, one USFS study acknowledged that as much as 325 gallons per minute (over five times as much) is diverted to Sellers, with a total annual use averaging 110 acre feet. An alternative suggestion was to modify the diversion to have "measuring and data collection devices installed" or to install smaller pipes to monitor the water flow. AR at 63, 68. The request was made because "[m]easuring and monitoring the flow of water will allow for compliance with the State's permit." *Id*. The USFS dismissed this request without analysis or comment. Presumably, the USFS considered this to be an unauthorized interference with Sellers' water rights. As explained more fully above, however, the USFS has the federal regulatory authority to place conditions on its rights-of-way, and such an action would enforce, rather than restrict, Sellers' water rights. The USFS has included similar restrictions in other scenarios. For example, *in Idaho Watersheds Project v. Jones*, 253 Fed. Appx. 684, 686 (9th Cir. 2007), "a term of [an] easement from the Forest Service require[d]" the holders of the easement "to install both a head gate and a fish screen before further diverting water from Otter Creek." *Id*. The Forest Service included that condition, and the Ninth Circuit upheld that condition, because "the Forest Service is obligated under law to impose restrictions on easements that minimize harm to wildlife." *Id*. Accordingly, the USFS erred to conclude that it had no authority to place conditions on the SUP, and violated NEPA by failing to consider these suggestions

in its scoping period.

The USFS's erroneous conclusion that it had no authority to condition the SUP to require minimum bypass flows or other rights-of-way restrictions led to its unreasonable failure to consider the requests to do so in its scoping period. *Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) (when a dispute is primarily legal in nature, or concerns a threshold question of law, this Court applies the more lenient "reasonableness" standard.). "To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data." *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005); *see also*, *Nat'l Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (court will vacate agency action if agency "entirely failed to consider an important aspect of the problem"). Accordingly, this Court finds that the USFS violated NEPA by failing to consider the request during its scoping period.

Although this Court finds that the USFS *could* have placed a minimum bypass flow or water meter condition on the Sellers' SUP, this Court has no opinion as to whether it *should* have included such restrictions. As explained more fully below, this Court remands this issue to the USFS for further consideration. Specifically, the USFS shall address the requests to place certain conditions on the Sellers' SUP, including the request: (1) to condition the SUP on a minimum flow requirement; (2) to require a monitoring and measuring device be placed on the diversion; and (3) to reduce the size of the pipes that divert water from Fay Creek.

**Whether USFS Violated NEPA by Applying a Categorical Exclusion to the SUP**

The USFS concluded that the SUP qualified as a categorical exclusion, because it was a "continuation of minor special uses of National Forest System lands that require less than five contiguous acres of land." The USFS concluded that it may approve the SUP where, as here, it approved "continued use of land where such use has not changed since authorized and no change in the physical environment or facilities are proposed." Sequoia Forestkeeper argues that this decision was arbitrary and capricious, because the SUP is not a "minor special use" and impacts more than five contiguous acres of land. For the following reasons, this Court finds that the USFS did not act arbitrarily and capriciously by applying a categorical exclusion to the re-issuance of the SUP.

1   The SUP fits within the acreage requirements.  The USFS described the "permitted area" as
2   "approximately 0.15 acres." AR at 143.  This area includes the dam structure, the "sand box" that is part
3   of the diversion structure, and approximately 250 feet of diversion pipe to comprise the area "affected
4   by the permitted structure." AR at 225.  Sequoia Forestkeeper argues that "the area directly and
5   significantly impacted by the dam/river diversion far exceeds five acres because of the direct impacts
6   it causes downstream and on Sellers' operation of his ranch."  Although the SUP might impact more
7   than five acres of land, the categorical exclusion concerns the use of more than five acres of National
8   Forest System land.  The plain language of the categorical exclusion applies to "uses of National Forest
9   System lands that require less than five contiguous acres of land."  The use at issue–use of the diversion
10  for water transmission–requires less than five contiguous acres of land.  It is undisputed that the
11  diversion covers only an area of approximately .015 acres of National Forest System land, and does not
12  reach beyond five acres total, including Sellers' land.

13   The SUP would fall outside of the categorical exclusion if the special use was not minor, or, if
14  the proposed action was a "major Federal action."  As described more fully above, NEPA does not
15  require an environmental analysis of all proposed federal agency actions.  NEPA requires the preparation
16  of an EIS only with respect to "major Federal actions" that significantly affect the quality of the human
17  environment.  Moreover, an EIS is not necessary "where a proposed federal action would not change the
18  status quo," *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 92 1 F.2d 232, 235 (9th Cir. 1990),
19  and is only required if the ongoing activity rises to the level of a "major Federal action." *County of*
20  *Trinity v. Andrus*, 438 F. Supp. 1368, 1388 (E.D. Cal. 1977).  "By definition...a categorical exclusion
21  does not create a significant environmental effect; consequently, the cumulative effects analysis required
22  by an environment assessment need not be performed.  That assessment has already been conducted as
23  part of the creation of the exclusion." *Utah Envt'l Cong*., 443 F.3d at 741.  Thus, this Court need not
24  consider whether the direct, indirect and cumulative effects create a significant environmental effect.
25  This Court need only consider whether the SUP approves a "minor" special use or a "major federal
26  action."

27   This Court finds that the USFS did not commit clear error to determine that the SUP was a
28  "minor" special use.  NEPA and its regulations do not define either a "minor" special use or a "major

28

Federal action." "No litmus test exists to determine what constitutes "major Federal action." *Save Barton Creek Ass'n v. Federal Highway Admin*., 950 F.2d 1129, 1134 (5th Cir. 1992). Here, the USFS was guided by the FSH, which provides that the "continued use of land where such use has not changed since authorized and no change in the physical environment or facilities are proposed" qualifies under the categorical exclusion. This Court defers to the "agency's interpretation of the meaning of its own categorical exclusion...unless plainly erroneous or inconsistent with the terms of the regulation." *Alaska Ctr. for the Env't*, 189 F.3d at 857. Here, the example was not plainly erroneous, and the re-issuance of the SUP fit the example. Thus, the proposed action satisfied the agency's interpretations of its categorical exclusion. In addition, both *Upper Snake River*, 921 F.2d 232, and *County of Trinity*, 438 F. Supp. 1368, support the USFS's conclusion that the re-issuance of the SUP would not be a "major federal action." *See, e.g., Upper Snake River*, 921 F.2d at 235 (operation of a dam, that had operated for years before NEPA was enacted was not a "major federal action" where its "operation is and has been carried on and the consequences have been no different than those in years past.").

The USFS had a reasonable basis to conclude that the SUP required fewer than five contiguous acres of land, and was for a "minor" use. Accordingly, the USFS did not act arbitrarily to conclude that the SUP qualified as a categorical exclusion. *See, Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) ("An agency's determination that a particular action falls within one of its own categorical exclusions is reviewed under the arbitrary and capricious standard.").

**Whether USFS Violated NEPA by Finding that No Extraordinary Circumstances Exist**

The USFS may apply a categorical exclusion only if there are no "extraordinary circumstances related to the proposed action." Sequoia Forestkeeper argues that extraordinary circumstances exist, because Mr. Christenson commented that Fay Creek "provides a wetland environment in an otherwise arid area." AR at 19. No other study characterized Fay Creek as a wetland. Accordingly, the USFS did not act arbitrarily and capriciously to find that there were no extraordinary circumstances. In addition, Sequoia Forestkeeper argues that the SUP allows a "complete de-watering of a stream that includes fishery habitat." Sequoia Forestkeeper also argues that the "cumulative impact" of the SUP should have been considered. The Court has addressed, and rejected, these arguments above. Although the State Department of Fish and Game opined that the SUP allowed the "complete de-watering" of Fay Creek

1  during certain months, the USFS conclusion that no extraordinary circumstances existed was based on

2  the USFS experts' opinions and other evidence supported in the record.  Accordingly, the USFS decision

3  was not arbitrary and capricious.

4  **Relief**

5  Because the USFS failed to demonstrate that it made a "reasoned decision" to re-issue the SUP

6  "based on all of the relevant factors and information," the re-issuance was "arbitrary and capricious."

7  *Id*. (citing *Marsh*, 490 U.S. at 378); *see also*, 40 C.F.R. 1505.1.  "When an agency decides to proceed

8  with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska*

9  *Ctr.*, 189 F.3d at 859.  "[W]hen an agency has taken action without observance of the procedure required

10 by law, the action will be set aside." *Sierra Club*, 510 F.3d at 1023 (citing *Idaho Sporting Cong., Inc.*

11 *v. Alexander*, 222 F.3d 562, 567-68 (9th Cir. 2000).

12 Sequoia Forestkeeper requests this Court to: (1) declare that the USFS's decision to approve

13 the SUP was arbitrary, capricious, and in violation of the NFMA and NEPA; (2) vacate the SUP and

14 remand the matter to the USFS for the preparation of an environmental analysis; (3) order the USFS

15 to condition the SUP to protect water quality, fisheries, and downstream, instream, and riparian

16 habitat; (4) enjoin the USFS from operating the diversion without requiring a minimum flow of 50%;

17 (5) enjoin the USFS from operating the diversion structure without installing automatic flow control

18 devices; and (6) order the USFS to conduct periodic (at least weekly) monitoring of the diversion and

19 to report these results.  Sequoia Forestkeeper argues that it has satisfied all of the elements required

20 for injunctive relief.

21 The Court may only grant a preliminary injunction "upon a clear showing that the plaintiff is

22 entitled to such relief."  *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008).  "Plaintiffs

23 seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they

24 are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips

25 in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577

26 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 129 S.Ct. at 374).  In considering the four factors, the

27 Court "must balance the competing claims of injury and must consider the effect on each party of the

28 granting or withholding of the requested relief." *Winter*, 129 S.Ct. at 376 (quoting *Amoco Co. v. Vill.*

1 | *of Gambell, Alaska*, 480 U.S. 531 542 (1987)); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572

2 | F.3d 644, 651 (9th Cir. 2009).

3 | **Likelihood of Success**

4 | As discussed more fully above, this Court finds that the USFS did not violate the NFMA, and

5 | did not err to find that the SUP fell within one of its categorical exclusions.  This Court found that the

6 | USFS violated NEPA, however, because it failed to consider some comments based on its erroneous

7 | conclusion that it had no legal authority to place conditions that would restrict water flowing through

8 | the diversion.  Accordingly, Sequoia Forestkeeper has established the likelihood of the merits on this

9 | claim only.

10 | **Irreparable Harm Absent Injunctive Relief**

11 | Sequoia Forestkeeper argues that in "the NEPA context, irreparable injury flows from the failure

12 | to evaluate the environmental impact of a major federal action." *Sierra Club*, 510 F.3d at 1034.  Indeed,

13 | "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often

14 | permanent or of long duration, *i.e.*, irreparable." *Id*. (quoting *Amoco Prod. Co. v. Village of Gambell*,

15 | 480 U.S. 531, 545 (1987)).  Nevertheless, a violation of NEPA "does not automatically require the

16 | issuance of an injunction." *Id*.  This Court disagrees with the USFS's claim that any NEPA violation is

17 | merely a "trivial violation" pursuant to 40 C.F.R. §1500.3.  As discussed more fully above, however,

18 | this Court also finds that Sequoia Forestkeeper has failed to establish that the "proposed project may

19 | significantly degrade some human environmental factor." *Nat'l Parks & Conservation Ass'n*, 241 F.3d

20 | at 737.  Because the diversion has been in place since 1890, little evidence exists as to the impact, if any,

21 | that the diversion has had on that environment below it.  Sequoia Forestkeeper has not established with

22 | specificity what irreparable harm would occur by allowing the diversion to continue to operate as it has

23 | for over 100 years.  Accordingly, this factor disfavors injunctive relief.

24 | **Public Interest**

25 | The public interest favors injunctive relief.  "[A]llowing a potentially environmentally damaging

26 | program to proceed without an adequate record of decision runs contrary to the mandate of NEPA" and

27 | contrary to the public interest. *Sierra Club*, 510 F.3d at 1033.  "The preservation of our environment,

28 | as required by NEPA and NFMA, is clearly in the public interest." *Earth Island Inst. v. U.S. Forest.*

1    *Serv.*, 351 F.3d 1291, 1308 (9th Cir. 2003).

2                                **Balance of the Hardships**

3            The purpose of a a preliminary injunction is to preserve the status quo if the balance of equities

4    so heavily favors the moving party that justice requires the court to intervene to secure the positions of

5    the parties until the merits of the action are ultimately determined.  *University of Texas v. Camenisch*,

6    451 U.S. 390, 395, 101 S.Ct. 1830 (1981). "Status quo" means the last uncontested status that preceded

7    the pending controversy. *See, GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).

8    Here, the status quo would be to allow Sellers to continue to divert water through the diversion.  Water

9    has been flowing through the diversion for over 100 years.  Sequoia Forestkeeper seeks a mandatory

10   injunction that "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly

11   disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quoting *Martinez v.*

12   *Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*

13   *& Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  Although the USFS may place conditions on Sellers' use

14   of the diversion, and may require Sellers to attach monitors or meters, or install smaller pipes, it is not

15   clear from the record how, or whether, USFS could stop the Sellers' use of the diversion altogether and

16   how that would affect Sellers' water rights.  The clear harm that a mandatory injunction would cause the

17   USFS is greater than the undefined and speculative harm that Sequoia Forestkeeper claims would occur

18   absent the injunction.  Accordingly, this balance of the equities tips against the issuance of the injunctive

19   relief sought. *See, Sierra Club*, 510 F.3d 1034 (recommending injunction to be limited to those projects

20   that have not yet been approved).

21                                     **Conclusion**

22           For the foregoing reasons, this Court REMANDS this action to the USFS for further

23   consideration and analysis, but ORDERS that the status quo should remain while the USFS completes

24   its supplemental scoping analysis of its re-issuance of the SUP.

25                                 **<u>ORDER</u>**

26           For the foregoing reasons, this Court:

27   1.      GRANTS judgment in favor of Sequoia Forestkeeper and against the USFS on

28           Sequoia Forestkeeper's second cause of action;

                                          32

1   2.  GRANTS judgment in favor of the USFS and against Sequoia Forestkeeper on

2       Sequoia Forestkeeper's first, third, and fourth causes of action; and

3   3.  REMANDS this action to the USFS for further consideration consistent with this

4       opinion.

5 IT IS SO ORDERED.

6 **Dated: December 3, 2010**    /s/ Lawrence J. O'Neill

                 UNITED STATES DISTRICT JUDGE